# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| OMT ADDICTION CENTERS, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | No. 3:24-cv-00356 |
| FREEDOM HEALTHCARE PROPERTIES OF TEXAS, LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

OMT Addiction Centers, LLC ("OMT"), Addiction Campuses of Massachusetts, LLC ("AC Massachusetts"), Addiction Campuses of Texas, LLC ("AC Texas"), and Addiction Campuses of Ohio, LLC ("AC Ohio") (collectively, "Plaintiffs") bring suit against Freedom Healthcare Properties of Texas, LLC ("FHPT") and AC Real Estate Group, LLC ("ACREG") (collectively, "Defendants"). (Doc. No. 1). This case is the fourth suit arising out of disputes between the parties as to their respective rights and obligations arising from lease agreements for addiction treatment center facilities in Texas, Ohio, and Massachusetts. (See id.). Before the Court is Defendants' Motion to Dismiss, or in the Alternative, to Stay Litigation (Doc. No. 26), which has been fully briefed and is ripe for review (Doc. Nos. 27, 33, 35). The parties have also filed supplemental briefing on the whether the Court should exercise its jurisdiction over Plaintiffs' declaratory judgment claims (Doc. Nos. 43, 44), as well as the status of related litigation in other federal and state courts (Doc. No. 54).

For the following reasons, the Court will: grant in part Defendants' Motion to Dismiss (Doc. No. 26) on Counts II, III, and V, and will deny in part on Counts I and IV. Because of the

Court's dismissal of Counts II, III, and V, ACREG, AC Ohio, and AC Massachusetts will be dismissed from this action. Further, the Court will grant AC Texas's request to stay proceedings pending the outcome of the related action in the Northern District of Texas, Case No. 3:24-cv-00789-N.

## I. BACKGROUND AND FACTUAL ALLEGATIONS[1]

Plaintiffs operate in-patient addiction treatment centers through three separate lease agreements with Defendants. (Doc. No. 1 ¶¶ 9, 17, 44, 59). The Court will discuss each of the three lease agreements separately.

### 1. The Texas Lease

On April 1, 2017, FHPT and AC Texas entered into a lease agreement for property located in Scurry, Texas ("Texas Lease"). (Id. ¶ 17). The Texas Lease requires that AC Texas, the tenant, pay FHPT, the landlord, on the first of each month. (Id. ¶ 28). On February 7, 2023, FHPT began eviction proceedings against AC Texas for its various purported failures under the Texas Lease, which eventually led to litigation in Kaufman County, Texas. (Id. ¶¶ 18–19).

A few months later, on June 25, 2023, FHPT, OMT and AC Texas entered into a settlement agreement resolving that litigation ("Settlement Agreement").[2] (Id. ¶ 19; Doc. No. 1-3). Pursuant to Section 3(c) of the Settlement Agreement, AC Texas established an interest-bearing reserve account ("Reserve Account"), allowing FHPT to draw from it in the event of AC Texas's default. (Doc. No. 1 ¶ 21; Doc. No. 1-3 ¶ 3). Per the terms of the Settlement Agreement, OMT and AC Texas fully funded the Reserve Account with $2.5 million. (Doc. No. 1 ¶ 22; Doc. No. 1-3 ¶ 3(a)).

---

[1] The Court draws the facts in this section from the Complaint (Doc. No. 1) and assumes the truth of those facts for purposes of ruling on the instant motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[2] OMT is the sole member of AC Texas. (Id. ¶¶ 1, 3).

2

During and after executing the Settlement Agreement, AC Texas and FHPT continued to operate under the Texas Lease. (Doc. No. 1 ¶ 28).

On January 2, 2024, counsel for AC Texas sent a letter to counsel for FHPT regarding AC Texas's use of the Reserve Account. (Id. ¶ 24). In the letter, AC Texas's counsel suggested that AC Texas and FHPT utilize the Reserve Account in relation to AC Texas's monthly rent payments, stating:

> Under the Settlement Agreement, all interest accrued in the Evergreen Reserve Account is to be credited to Addiction Campuses of Texas, and no limitation is imposed thereunder on my client's ability to access or withdraw excess funds (*i.e.* in excess of 2.5mm (the "Excess Funds")) from the account.
>
> Going forward, I am recommending to my client that it reduce its monthly rental payments by the dollar amount of Excess Funds in the Evergreen Reserve Account at the time. Your client can then withdraw the Excess Funds to cover the shortfall in my client's rental payment.

(Doc. No. 1-4). A month later, AC Texas's counsel followed up with FHPT's counsel via email, requesting that "the monthly rent payment <u>for the Texas property</u> be withdrawn by the landlord from the [] [Reserve] [A]ccount[.]" (Doc. No. 1-5 at 3). FHPT's counsel responded the same day, stating AC Texas's "proposal regarding the [] Reserve Account [was] rejected." (Id. at 2).

On February 28, 2024, counsel for AC Texas requested a mailing address to send a check for AC Texas's supposed overdue February rent. (Doc. No. 1 ¶ 27). FHPT refused to accept mailed funds due to the delay in processing them, and requested the funds be sent by wire instead. (Id.; Doc. No. 1-7). However, AC Texas had already sent a check for the February rent. (Doc. No. 1 ¶ 29). To ensure FHPT had immediate access to AC Texas's funds for the February rent, AC Texas's counsel suggested that FHPT take funds out of the Reserve Account, and utilize AC Texas's check for February rent to replenish the Reserve Account. (Id.). Counsel for FHPT again

3

refused, stating that was not the purpose of the Reserve Account.  (Id.).  As of February 29, 2024, the balance in the Reserve Account totaled $2,531,314.84.  (Id. ¶ 26).

On February 29, 2024, AC Texas sent FHPT another check with full payment of its March rent, which FHPT received the next day.  (Id. ¶ 30).  On March 4, 2024, counsel for FHPT confirmed that FHPT received the checks for AC Texas's February and March rents, but stated they had not yet been cleared by the bank.  (Id. ¶ 32).  That same day, FHPT issued a Texas Notice to Vacate to AC Texas, asserting it was behind on its February and March rents ("Texas Notice"). (Id. ¶ 31; Doc. No. 1-9 at 1).  Four days later, FHPT filed for eviction via an Original Verified Petition—Eviction Case before a Justice of the Peace in Kaufman County, Texas.  (Doc. No. 1 ¶ 39; Doc. No. 1-11).  The eviction matter was set for April 3, 2024.  (Doc. No. 1 ¶ 43).

On April 2, 2024, AC Texas removed the case to the United States District Court for the Northern District of Texas ("Texas Eviction Action").  (Freedom Healthcare Properties of Texas, LLC v. Addiction Campuses of Texas, LLC, Case No. 3:24-cv-00789-N, Doc. No. 1).  The Amended Complaint in the Texas Eviction Action alleges AC Texas committed violations of the Texas Lease by failing to timely pay rent in January, February, and March 2024.  (Id. at Doc. No. 26 ¶¶ 12, 13, 15).  AC Texas answered, asserting affirmative defenses that FHPT's claims are "barred by the terms of the Lease Agreement and the [] Reserve Account" because the Reserve Account "was fully funded and at the disposal of Plaintiff to pay all rent, operating expenses, real estate taxes, and any other monetary costs made the subject of th[e] lawsuit."  (Id. at Doc. No. 29 ¶ 27).  From January 21, 2025 to January 22, 2025, Chief Judge David C. Godbey conducted a bench trial.  (Id. at Doc. Nos. 52, 53).  Judgment in the case is still pending.

Almost three weeks after FHPT brought suit against AC Texas in Texas state court, AC Texas and OMT initiated this suit, alleging FHPT breached the Settlement Agreement (Count IV)

and seeking declaratory and injunctive relief pertaining to the Texas Lease and the Settlement Agreement (Counts I, V).  (Doc. No. 1 ¶¶ 72–75, 84–97).

   2.   The Ohio Lease

On February 28, 2017, ACREG and AC Ohio entered into an Amended and Restated Lease Agreement that encompassed the use of property located in Sherrodsville, Ohio ("Ohio Lease").[3] (Doc. No. 1 ¶ 44; Doc. No. 1-13; Doc.  No. 1-18).  Like the Texas Lease, the Ohio Lease requires AC Ohio, as the tenant, to make monthly payments to ACREG, the landlord, on the first day of each month.  (Doc. No. 1 ¶ 45).

As with the circumstances surrounding the dispute arising from the Texas Lease, on February 28, 2024, counsel for AC Ohio requested a mailing address to send rent checks to ACREG.  (Id. ¶ 46).  Counsel for ACREG responded, stating it was too late to mail funds, and instructed AC Ohio to deliver the funds by wire.  (Id.).  The next day, AC Ohio sent full payment

---

[3] In June 2023, AC Ohio Real Estate Group, LLC and AC Ohio entered into the Second Amendment to the Lease Agreement.  (Doc. No. 1-18).  The Second Amendment to the Lease Agreement makes various material changes to the Ohio Lease, including replacing ACREG with AC Ohio Real Estate Group, LLC as the tenant, and amending many of the Ohio Lease's terms.  (Id.).

Despite the Second Amendment to the Lease Agreement indicating that AC Ohio Real Estate Group, LLC was the landlord during the period leading to the instant suit, the Complaint makes no allegations as to AC Ohio Real Estate Group, LLC's involvement.  The parties do little to clear up the relationship (or lack thereof) between ACREG and AC Ohio Real Estate Group, LLC in their briefing.  Instead, Plaintiffs merely state that the former is in privity with the latter because it is the successor landlord under the Second Amendment to the Lease, and that both "are affiliated and/or under common ownership in control."  (See Doc. No. 44 at 2 n.1, 3).  Given ACREG's silence on this issue, and the Second Amendment to the Lease Agreement referring to AC Ohio Real Estate Group, LLC as the landlord in the Ohio Lease (see Doc. No. 1-18 ¶ A), the Court accepts Plaintiffs' representation as true for the purposes of resolving the instant motion, and will refer to AC Ohio Real Estate Group, LLC and ACREG interchangeably.

Given that the Second Amendment to the Lease Agreement is intended to modify the Ohio Lease (see Doc. No. 1-18 ¶ C ("The parties now desire to amend the Lease Agreement in accordance with the terms and provisions hereof.")), the Court will consult both when referencing the Ohio Lease in this opinion.

on its February rent, including late fees, to ACREG. (Id. ¶ 47). The following day, AC Ohio sent a second check to ACREG for its March rent. (Id.; Doc. No. 1-14). On March 4, 2024, counsel for ACREG confirmed it had received the checks, which were all cashed that day. (Doc. No. 1 ¶ 28).

However, two days later, ACREG delivered a Notice to Leave the Premises to the Ohio Premises that required AC Ohio surrender possession on or before March 9, 2024 ("First Ohio Notice"). (Id. ¶ 50; Doc. No. 1-16). The First Ohio Notice stated the reason AC Ohio was to leave the premises was the non-payment of rent. (Doc. No. 1-16). ACREG informed AC Ohio that its failure to pay pertained to unpaid operating expenses, but did not provide pay receipts demonstrating those expenses. (Doc. No. 1 ¶ 56). On March 17, 2024, a Notice to Leave the Premises was again delivered to the Ohio Premises ("Second Ohio Notice"). (Id. ¶ 58).

On March 28, 2024, AC Ohio filed the instant suit against ACREG, seeking declaratory and injunctive relief pertaining to the Ohio Lease. (Id. ¶¶ 76–79, 89–97). On May 13, 2024, AC Ohio Real Estate Group, LLC brought suit against AC Ohio in the Carroll County Municipal Court ("Ohio Eviction Action"). (Doc. No. 27-2, Docket Sheet for A.C. Ohio Real Estate Group, LLC v. Addiction Campuses of Ohio, LLC, Case No. CVG2400170)). The Ohio Eviction Action was then transferred to the Court of Common Pleas. (AC Ohio Real Estate Group, LLC v. Addiction Campuses of Ohio, LLC, Case No. 2024CVH30561). The Ohio court granted summary judgment for AC Ohio and entered judgment on its behalf. (Doc. No. 54 at 2). AC Ohio then filed a motion for sanctions against AC Ohio Real Estate Group, LLC, which remains pending before the Ohio court. (See id.).

### 3. The Massachusetts Lease

On June 1, 2016, ACREG and AC Massachusetts entered into a lease agreement that encompassed land in Cummington, Massachusetts ("Massachusetts Lease") (collectively with the

6

Texas Lease and the Ohio Lease, "Leases"). (Doc. No. 1 ¶ 59; Doc. No. 1-19). As with the Texas and Ohio Leases, the Massachusetts Lease requires AC Ohio, the tenant, to make monthly payment on the first day of each month to ACREG, the landlord. (Doc. No. 1 ¶ 60).

Like the events leading to the Texas and Ohio Eviction Actions, on February 28, 2024, counsel for AC Massachusetts requested a mailing address to send a check for March rent. (Id. ¶ 61). Again, counsel for ACREG responded stating it was too late to mail funds, and demanded they be wired. (Id.). AC Massachusetts sent full payment of its February rent, including late fees, to ACREG the next day. (Id. ¶ 62). The following day, AC Ohio sent a second check for its March rent. (Id.). On March 4, 2024, counsel for ACREG stated the checks received for the February and March rents had not yet cleared at the bank. (Id. ¶ 63). Two days later, ACREG issued a 14-Day Notice to Quit for Non-Payment of Rent ("Massachusetts Notice"). (Id. ¶ 65; Doc. No. 1-20). In conjunction with the Massachusetts Notice, ACREG informed AC Massachusetts it was in default due to unpaid operating expenses, but again did not provide receipts demonstrating those expenses. (Doc. No. 1 ¶¶ 68, 71).

On March 26, 2024, ACREG filed suit against AC Massachusetts in the Northampton County District Court of Massachusetts ("Massachusetts Eviction Action") (collectively with the Texas Eviction Action and Ohio Eviction Action, "Eviction Actions"). (Doc. No. 27-1 (showing the Ohio Eviction Action's docket)). Two days later, AC Massachusetts filed the instant suit against ACREG, seeking declaratory and injunctive relief pertaining to the Massachusetts Lease. (Doc. No. 1 ¶¶ 80–83, 89–97). The Massachusetts Eviction Action has passed the summary judgment stage, and is set for a two-day trial starting on June 26, 2025. (Doc. No. 54 at 2; AC Real Estate Group, LLC v. Addiction Campuses of Massachusetts, LLC d/b/a Swift River Rehab, Case No. 2445SU000003).

7

## II.    DISCUSSION

Before the Court are: Defendants' motion to dismiss under the <u>Colorado River</u> abstention doctrine, or alternatively, to stay proceedings pending the resolution of the Eviction Actions (Doc. No. 27 at 1); and the parties' briefing on whether the Court should exercise its jurisdiction over Counts I, II and II, considering the <u>Grand Trunk</u> factors (Doc. Nos. 43, 44).[4]  <u>See Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976); <u>Grand Trunk W. R.R. Co. v. Consol. Rail Co.</u>, 746 F.2d 323, 326 (6th Cir. 1984).  The Court will address both doctrines, as applied to the instant case, in turn.

### 1.    <u>Legal Standard</u>

Defendants bring their motion to dismiss based on the <u>Colorado River</u> abstention doctrine under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. No. 27 at 6).  Defendants' confusion as to the proper vehicle for their motion is understandable, given the disagreement among courts on the topic.  Courts in the Sixth Circuit have inconsistently applied both Rule 12(b)(1) and Rule 12(b)(6) to motions to dismiss brought pursuant to the <u>Colorado River</u> abstention doctrine and the <u>Grand Trunk</u> factors, largely based on the federal rule invoked by the

---

[4] The parties' briefing on Defendants' motion did not contemplate the <u>Grand Trunk</u> factors, based on Defendants' flawed assumption that the Declaratory Judgment Act does not apply here because it is not directly referenced in the Complaint (see Doc. No. 35 at 3–4).  <u>See Wilton v. Seven Falls Co.</u>, 515 U.S. 277 (1995) (the Declaratory Judgment Act provides the means through which a federal court may grant declaratory relief).  This omission is problematic, given Defendants bring their motion pursuant to the <u>Colorado River</u> abstention doctrine, which does not apply to the three claims for declaratory relief before this Court.  <u>Boyd v. Martinez</u>, 2023 WL 4903173, at *4 (6th Cir. Aug. 1, 2023) ("[T]he <u>Colorado River</u> abstention doctrine framework does not apply where the federal court action is one for a declaratory judgment."); <u>see Wilton</u>, 515 U.S. at 289 ("In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.").  Accordingly, the Court ordered the parties to brief the applicability of the <u>Grand Trunk</u> factors to Counts I, II and III to aid the Court in properly evaluating Defendants' motion.  (Doc. No. 40 at 2–3).

movant.[5]  See, e.g., Matwyuk v. Johnson, 22 F. Supp. 3d 812, 816, 820 (W.D. Mich. May 23, 2014) (evaluating Grand Trunk argument brought a Rule 12(b)(1) motion); Driskill v. Regions Bank, 2019 WL 13122497, at *2 n.2 (E.D. Tenn. Mar. 22, 2019) (viewing Colorado River arguments as contesting jurisdiction pursuant to Rule 12(b)(1)); but see, e.g., Malibu Media, LLC v. Redacted, 705 F. App'x 402, 405, 407 (affirming district court's dismissal of claim under Rule 12(b)(6) pursuant to application of Grand Trunk factors where the declaratory judgment claim was duplicative of another claim); BLC Lexington SNF, LLC v. Craig, 2020 WL 4721240, at *6 (E.D. Ky. Aug. 13, 2020) (rejecting Rule 12(b)(1) as the proper rule to evaluate Colorado River under where "diversity-based subject-matter jurisdiction exists").  To this Court's knowledge, neither the Supreme Court, nor the Sixth Circuit, have definitively addressed the proper mechanism for motions to dismiss brought pursuant to these doctrines.

Without persuasive authority demonstrating the contrary, the Court finds arguments for dismissal under either the Colorado River abstention doctrine or pursuant to the Grand Trunk factors are most appropriately grounded in Rule 12(b)(1).  Neither Rule 12(b)(1) or 12(b)(6) fit perfectly as the vehicle for a motion reliant on either doctrine.  Neither doctrine explicitly challenges this Court's subject matter jurisdiction; Plaintiffs' standing, and the Court's diversity jurisdiction, are not in question.  Nor do the doctrines state that the affected claims are not plausibly alleged, and Defendants do not argue as much.  However, because Rule 12(b)(6) judgments are on the merits, Rule 12(b)(1) is the more appropriate vehicle for dismissal because dismissal pursuant to either doctrine would not be on the merits of Plaintiffs' claims.  See Rogers v. Stratton Indus., Inc., 798 F.2d 913, 916 (6th Cir. 1986) ("Normally, Rule 12(b)(6) judgments are dismissals on the

---

[5] Given the parties' supplemental briefing on the applicability of the Grand Trunk factors to Counts I, II and III (see Doc. Nos. 43, 44), the Court will evaluate the proper federal rule to consider both doctrines under.

9

merits and Rule 12(b)(1) dismissals are not.").  Thus, the Court will consider the applicability of the Colorado River abstention doctrine and the Grand Trunk factors in the instant case under Rule 12(b)(1).

"[W]here subject matter jurisdiction is challenged under Rule 12(b)(1)," as Defendants do here, "the *plaintiff* has the burden of proving jurisdiction in order to survive the motion."  Rogers, 798 F.2d at 915; see Abbot v. Michigan, 474 F.3d 324, 328 (6th Cir. 2007).  "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)."  Cartwright v. Garner, 751 F.3d 752, 759 (6th Cir. 2014) (citing United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994)).  A facial attack goes to whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of the Rule 12(b)(1) analysis.  Ritchie, 15 F.3d at 598.  A factual attack challenges the factual existence of subject matter jurisdiction.  Id.  In the case of a factual attack, the Court has broad discretion on what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings.  Id.  The Court may weigh the evidence and determine the effect of that evidence on the court's authority to hear the case.  Id.  Defendants do not specify whether they make a facial or factual challenge.  (See generally Doc. No. 27).  However, Defendants do state that they "accept all the factual allegations in the Complaint as true," suggesting Defendants intended to bring a facial challenge.  (Id. at 2 n.1).  Accordingly, the Court construes Defendants' motion as a facial challenge to the Complaint and limits its consideration to the allegations of the Complaint and assumes them to be true.  Ritchie, 15 F.3d at 598.

In evaluating a motion to dismiss, the Court may consider the Complaint and the exhibits attached.  Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008).  The Sixth

10

Circuit also permits courts to consider other items in assessing a motion to dismiss, such as "public records, items appearing in the record of the case and exhibits attached to [the] motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." Id.  To properly evaluate Defendants' motion, the Court considers public filings in the Eviction Actions, as well as items on the docket regarding the Eviction Actions, because their subject matter are referenced in the Complaint and are central to Plaintiffs' claims.  See id.; see also New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003); Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007) ("A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment.").

2.    Applicability of the Grand Trunk Factors to Counts I, II and III

Two doctrines that focus upon "efficiency, fairness, and federalism" are before the Court: the Colorado River abstention doctrine and the Grand Trunk factors.  Boyd, 2023 WL 4903173, at *5 (quoting Western World Ins. Co. v. Hoey, 773 F.3d 755, 759 (6th Cir. 2014)).  Because the Colorado River abstention doctrine does not apply to claims for declaratory relief, id. at *4, the Court will evaluate whether to exercise jurisdiction over Plaintiffs' declaratory judgment claims before determining the applicability of the Colorado River abstention doctrine.  See id. at *4–5 (applying Grand Trunk factors in lieu of Colorado River abstention factors where the claim at issue was for declaratory judgment).

The Declaratory Judgment Act, 28 U.S.C. § 2201 ("Act"), confers discretionary jurisdiction on district courts to determine the propriety of a request for declaratory relief independent of threshold subject matter jurisdiction requirements.  Wilton, 515 U.S. at 282 ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional

11

prerequisites.").  The exercise of this discretion is guided by a five-factor test.  Grand Trunk, 746

F.2d at 326.  These factors include:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

Id.  Plaintiffs bring three separate claims for declaratory relief.  Under Count I, AC Texas asserts

it is entitled to judicial declarations that:

> (1) payments made by check issued on or before the due date for rent are in compliance with the Texas Lease; (2) AC Texas operating expenses are inclusive of CAM, insurance, and taxes and remaining alleged operating expenses are improper under the Texas Lease; and (3) willful refusal to pull from the Reserve Account for overdue rent payments is tantamount to a failure of the landlord to properly utilize the Reserve Account and does not constitute a breach of the Texas Lease.

(Doc. No. 1 ¶ 75).  Under Counts II and III, AC Ohio and AC Massachusetts each seek the same

payment and operating expenses declarations that AC Texas seeks under Count I—AC Texas's

first two requests for declaratory relief—but as applied to the Ohio and Massachusetts Leases.  (Id.

¶¶ 79, 83).

Defendants assert Plaintiffs' declaratory judgment claims are not appropriate and that the

Court should not exercise its jurisdiction over them, given the third, fourth, and fifth factors

counsel against exercising jurisdiction. (Doc. No. 43 at 3–8).  Plaintiffs contend that the Court

should exercise its discretion over their declaratory judgment claims because the first, second,

fourth and fifth factors weigh in favor of exercising jurisdiction, and the fourth factor is in favor

of, or neutral to, exercising jurisdiction.  (Doc. No. 44 at 2–7).  The Court will address each Grand

Trunk factor below.

A. <u>Settlement of the Controversy and Clarification of the Legal Relations</u>

Because the first and second <u>Grand Trunk</u> factors are "closely related" and "often considered in connection with" one another, the Court will evaluate them together. <u>Scottsdale Ins. Co. v. Flowers</u>, 513 F.3d 546, 557 (6th Cir. 2008). In evaluating the first <u>Grand Trunk</u> factor, whether the declaratory action would resolve the dispute between the parties, courts consider whether it is an "independent dispute" such that its resolution would settle the controversy between the parties. <u>Grand Trunk</u>, 746 F.2d at 326. In evaluating the second <u>Grand Trunk</u> factor, whether a declaratory judgment would clarify the legal relations at issue, courts consider whether "the declaratory judgment [would] provide a final resolution of the discrete dispute presented." <u>Flowers</u>, 513 F.3d at 557.

Plaintiffs assert that these factors weigh in favor of the Court exercising its jurisdiction over their declaratory judgment claims, given "[a] declaration that there are no uncured Events of Default under the leases would preclude the Defendants from relitigating that issue in state court," the "declaratory judgment action will resolve the contractual disputes between" the parties, and the declarations would have a preclusive effect going forward. (Doc. No. 44 at 3–4). Defendants do not contest that these factors are in Plaintiffs' favor, as evidenced by their failure to address them entirely. (<u>See generally</u> Doc. No. 43). Defendants' omission of the first and second factors from their briefing is with good reason. The Court agrees with Plaintiffs' conclusion, if not all of their arguments, that these factors weigh in favor of the Court exercising its jurisdiction over their declaratory judgment claims.[6]

---

[6] Plaintiffs' preclusion argument is unpersuasive. (Doc. No. 44 at 3). Plaintiffs properly emphasize that the first and second <u>Grand Trunk</u> factors favor the federal court exercising jurisdiction where the declaratory judgment would have a preclusive effect on future actions for the same litigants or those in privity to them. <u>Byler v. Air Methods Corp.</u>, 823 F. App'x 356, 366

13

Plaintiffs' requests for declaratory relief are independent disputes that would provide finality to the legal rights and obligations of the parties under the Leases and the Settlement Agreement. On the Leases, Plaintiffs ask the Court for declarations that: (1) payments made by check issued on or before the due date of rent are in compliance with the respective Leases; and (2) operating expenses under the Leases are "inclusive of CAM, insurance, and taxes and remaining alleged operating expenses are improper." (Doc. No. 1 ¶¶ 75, 79, 83). Were the Court to grant Plaintiffs' requests for this declaratory relief, the independent disputes between the parties on whether Plaintiffs breached the Leases by mailing checks to Defendants, rather than wiring the rent funds, and whether AC Ohio and AC Massachusetts failed to pay "operating expenses" under the Leases, would be resolved. Grand Trunk, 746 F.2d at 326. These declaratory judgments would also provide final resolution to the parties as to the proper payment methods and obligations under the Leases. Flowers, 513 F.3d at 557.

The same is true for AC Texas's request for a declaration that "willful refusal to pull from the Reserve Account for overdue rent payments is tantamount to a failure of [FHPT] to properly utilize the Reserve Account" under the Settlement Agreement, and "[AC Texas's conduct] does not constitute a breach of the Texas Lease." (Doc. No. 1 ¶ 75). Should the Court provide AC

_____

(6th Cir. 2020) ("[T]he parties to the instant federal litigation are likely to be the same as those in any future state-court collection actions, thereby giving preclusive effect to the federal-court declaratory judgment action."); see also Sanders Confectionery Prods., Inc. v. Heller Fin., Inc., 973 F.2d 474, 481 (6th Cir. 1992) ("_Res judicata_ also bars those in privity with parties from bringing suit later. Privity in this sense means a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented."). However, that argument does not hold water in the instant case, given the Eviction Actions have progressed to such a point that they are likely to have a preclusive effect on _this_ Court's rulings on Plaintiffs' declaratory relief. (See, e.g., Freedom Healthcare Properties of Texas, LLC v. Addiction Campuses of Texas, LLC, Case No. 3:24-cv-00789-N, Doc. Nos. 52, 53 (Texas Eviction Action has already been to trial); Doc. No. 54 (courts in the Ohio and Massachusetts Eviction Actions have already made dispositive rulings)).

14

Texas with this declaratory relief, the disputes between AC Texas, OMT, and FHPT on the proper use of the Reserve Account under the Settlement Agreement, and the Reserve Account's relation to rent payments under the Texas Lease, would be final and clarifying for the parties. <u>Flowers</u>, 513 F.3d at 557. The declaration would also provide resolution on AC Texas's and OMT's breach of contract claim against FHPT. That claim, which is premised on FHPT's failure to use the Reserve Account for AC Texas's supposed overdue rent payment, would be resolved with the Court's clarification on whether FHPT had an obligation to use the Reserve Account for that purpose. (Doc. No. 1 ¶ 87).

Ultimately, the declaratory judgments Plaintiffs request here would both settle the controversy between the parties and clarify the legal relations between them. Accordingly, the Court finds the first and second <u>Grand Trunk</u> factors counsel for the Court exercising its jurisdiction. <u>See</u> <u>Grand Trunk</u>, 746 F.2d at 326.

## B. Procedural Fencing or Race for *Res Judicata*

On the third <u>Grand Trunk</u> factor, whether Plaintiffs are seeking declaratory relief for "procedural fencing" or to win a race for *res judicata*, "[t]he question is. . . whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." <u>AmSouth Bank v. Dale</u>, 386 F.3d 763, 788 (6th Cir. 2004). When a plaintiff files a declaratory judgment claim after state court litigation has begun, courts generally give the plaintiff "the benefit of the doubt that no improper motive fueled the filing of [the declaratory judgment] action." <u>Bituminous Cas. Corp. v. J&L Lumber Co., Inc.</u>, 373 F.3d 807, 814 (6th Cir. 2004). Regardless of the outcome of this factor, it "usually does not weigh heavily in the analysis." <u>United Specialty Ins. Co. v. Cole's Place, Inc.</u>, 936 F.3d 386, 399 (6th Cir. 2019).

The parties dispute which way this factor cuts. Defendants contend this factor either counsels against, or is neutral on, whether the Court exercises its jurisdiction over Plaintiffs'

15

claims, given Plaintiffs' declaratory judgment claims focus on the very issues before the state courts. (Doc. No. 43 at 4). Plaintiffs disagree, emphasizing that their declaratory judgment claims were filed after the Texas Eviction Action, originally filed in state court, and so there is no support for a finding of procedural fencing. (Doc. No. 44 at 5). Here, the Court agrees with Defendants that this <u>Grand Trunk</u> factor counsels against this Court exercising its jurisdiction over Counts I, II and III.

Plaintiffs are correct that at the time they filed the instant suit on March 28, 2024, OMT, AC Texas, and AC Massachusetts were already facing the Texas and Massachusetts Eviction Actions, filed on March 8 and March 26, respectively. (Doc. No. 1 ¶ 39; Doc. No. 1-11; Doc. No. 27-1). That the Texas and Massachusetts Eviction Actions had already begun by the time Plaintiffs filed this suit would normally counsel for this Court to give Plaintiffs the "benefit of the doubt" that this action is not improperly motivated. <u>Bituminous</u>, 373 F.3d at 814. However, viewing this case through that lens is too simplistic. Here, the factual circumstances tend to suggest Plaintiffs were engaging in a race to the merits with Defendants when filing here.

On March 4 and March 6, 2024, Defendants sent the Texas Notice, First Ohio Notice, and Massachusetts Notice informing Plaintiffs that they had failed to properly comply with rent payments under the Leases. (Doc. No. 1 ¶ 58; Doc. No. 1-9 at 1; Doc. No. 1-16; Doc. No. 1-20). By March 8, 2024, FHPT had already brought an eviction suit against AC Texas in Texas state court for its failure to pay rent under the Texas Lease. (Doc. No. 1 ¶ 39; Doc. No. 1-11). Nine days later, ACREG sent AC Ohio the Second Ohio Notice. (Doc. No. 1 ¶ 58). Nine days after that, ACREG brought suit against AC Massachusetts for its failure to comply with the Massachusetts Lease. (Doc. No. 27-1).

16

By the end of March 2024, "[t]he chain of events already in motion in [the] [Texas and Massachusetts] state court[s]" showed it was all but inevitable that the question of AC Ohio's performance under the Ohio Lease would soon be before an Ohio state court.  U.S. Fire Ins. Co. v. Albex Aluminum, Inc., 161 F. App'x 562, 565 (6th Cir. 2006).  Nevertheless, within two days of ACREG suing AC Massachusetts in Massachusetts state court, and before it eventually sued AC Ohio in Ohio state court, Plaintiffs brought suit here.  (Doc. No. 1).  The same day, Plaintiffs filed an unsuccessful Emergency Motion for Temporary Restraining Order and Preliminary Injunction, seeking injunctive relief "to prohibit Defendants from evicting Plaintiffs" and "a declaratory judgment that Plaintiffs are in compliance with their contractual obligations."[7]  (Doc. No. 3 at 2).  Effectively, Plaintiffs attempted to use this Court to stop the Eviction Actions right as they were beginning.

The Court acknowledges, and regularly abides by, the Sixth Circuit's general rule that courts "do not make a finding of procedural fencing if the declaratory-judgment plaintiff filed *after* the commencement of litigation in state court."  Cole's Place, 936 F.3d at 399.  However, the peculiar circumstances surrounding this case, and that the Ohio Eviction Action had not yet been filed at the time Plaintiffs brought this suit seeking emergency injunctive and declaratory relief, all demonstrate that Plaintiffs filed this suit in a race for *res judicata* with Defendants and those in privity in the Eviction Actions.  Plaintiffs' filing the instant suit and their emergency motion for injunctive and declaratory relief just days after the start of the Texas and Massachusetts Eviction Actions and AC Ohio's receipts of the First and Second Ohio Notices shows Plaintiffs are "trying

---

[7] Absent from the parties' briefing is a meaningful discussion of Count V, entitled "Injunctive Relief."  (Doc. No. 1 ¶¶ 89–97).  Because this is not a separate cause of action, but rather an equitable remedy, the Court will dismiss this claim under Rule 12(b)(6).  Goryoka v. Quicken Loan, Inc., 519 F. App'x 926, 929 (6th Cir. 2013) (finding the district court properly dismissed plaintiff's request for injunctive relief because it is "not [a] separate cause[] of action").

to secure a favorable ruling here, rather than take the risk that [they] will not fare as well in [Defendants'] [] state court action[s] against [them]." U.S. Fire Ins. Co., 161 F. App'x at 565. Considering this, the Sixth Circuit's instruction that federal courts should not "seize litigations from state courts merely because" the defendants in the state court actions came "to federal court to begin [their] federal-law defense before the state court[s] [began] the case[s] under state law" is certainly applicable here. AmSouth, 386 F.3d at 775 (quoting Pub. Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 248 (1952)).

At bottom, it is apparent that Plaintiffs are merely seeking "another forum in a race of *res judicata*." Hoey, 773 F.3d at 761. Such use of the federal judicial system is inappropriate. Accordingly, the Court finds this factor weighs against the Court exercising its jurisdiction over Plaintiffs' declaratory judgment claims.

### C. Increased Friction Between Federal and State Courts

The Court turns to the fourth Grand Trunk factor, whether exercising its jurisdiction would increase friction between state and federal courts. The Sixth Circuit uses three subfactors to evaluate this factor, including:

> (1) whether the underlying factual issues are important to an informed resolution of the case;
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
> (3) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

Bituminous, 373 F.3d at 814–15 (citing Flowers, 211 F.3d at 968). Defendants contend each subfactor weighs against exercising jurisdiction. (Doc. No. 43 at 5–7). On the other hand, Plaintiffs argue that the first two factors weigh in favor of exercising jurisdiction, and the third factor is neutral. (Doc. No. 44 at 5–6). The parties evaluate these subfactors in a manner that contemplates all of the Eviction Actions together. This approach is mistaken, as it fails to account

18

for how the subfactors' emphasis on related *state* court proceedings impacts Count I and the related Texas Eviction Action pending in *federal* court.  Bituminous, 373 F.3d at 814–15.  Because the Court finds this distinction significant, it will consider this factor twice: once for Counts II and III, in the Ohio and Massachusetts Eviction Actions pending in their respective state courts, and once for Count I, as related to the Texas Eviction Action pending in the Northern District of Texas.

### a. Counts II and III

The Court first addresses the subfactors as pertaining to Counts II and III.

### i. Underlying Factual Issues

The first subfactor, whether the underlying factual issues are important to an informed resolution of the case, "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action."  Flowers, 513 F.3d at 560.  This subfactor counsels against exercising jurisdiction where "resolution of the issue raised in federal court will require making factual findings that might conflict with similar findings made by the state court."  Id.  Defendants contend that there are various factual issues at play here, including: whether Plaintiffs' mailing rent checks constitute breaches of the Leases, and what the undefined "operating expenses" term means under the Leases.  (Doc. No. 43 at 5). Plaintiffs counter that these are not truly factual issues, but rather ones of contractual interpretation for the Court to decide.  (Doc. No. 44 at 5).

The Court agrees with Defendants that there are underlying factual issues implicated in Counts II and III that were likely raised in the Ohio and Massachusetts Eviction Actions such that the Ohio and Massachusetts state courts should decide the issues before this Court does.  AC Ohio and AC Massachusetts request declarations that: (1) "payments made by check issued on or before the due date for rent are in compliance with" Section 4 of the Leases; and (2) "operating expenses" under Section 6 of the Leases includes "CAM, insurance, and taxes and remaining alleged

19

operating expenses are improper under" the Leases. (Doc. No. 1 ¶¶ 79, 83). These declarations directly implicate the issues raised in the Ohio and Massachusetts Eviction Actions based on AC Ohio's and AC Massachusetts's alleged failures to properly pay rent and operating expenses. Because the Leases explicitly provide that "[t]he law of the state in which the Leased Property is located will be applicable," (Doc. No. 1-13 ¶ 30; Doc. No. 1-19 ¶ 30), the Court must evaluate AC Ohio's requests for declaratory relief under Ohio law (where AC Ohio leased the property), and AC Massachusetts's requests under Massachusetts law (where AC Massachusetts leased the property). See State Farm Mut. Auto. Ins. Co. v. Norcold, Inc., 849 F.3d 328, 331 (6th Cir. 2017) (choice-of-law rules of the forum state determine what substantive law to apply); U.S. v. Republic Ins. Co., 775 F.2d 156, 160 (6th Cir. 1985) (under Tennessee law, "[i]n the absence of a *manifestation of contrary intention*, the parties are presumed to have contracted pursuant to the laws of the state in which the contract was entered into") (emphasis added) (internal citation omitted).

At first glance, Plaintiffs' position that these declarations require mere contractual interpretation by the Court has merit. Indeed, interpretations of Sections 4 and 6 of the Leases are normally questions of law for the Court's determination. Tera, LLC v. Rice Drilling D, LLC, 176 Ohio St.3d 505, 509 (2024) (Under Ohio law, "[i]f a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.") (internal citations and quotations omitted); Smith v. DecisionOne Corp., 223 N.E.3d 550 (Mass. Ct. App. 2024) (table) (Under Massachusetts law, "the interpretation of an unambiguous contract is a question of law[.]"). However, where contract language is ambiguous, disputed facts may bear on the interpretation of the contractual language. See Tera, 176 Ohio St.3d at 509 (Under Ohio law, "resolution of an ambiguous term in a contract is a question of fact."); Smith, 223 N.E.3d 550

20

(Under Massachusetts law, "the interpretation of the parties' intent with respect to terms that are 'ambiguous, uncertain, or equivocal in meaning' is a question of fact."). Upon reviewing the Ohio and Massachusetts Eviction Actions and Leases, it is evident that both requested declarations implicate ambiguous contractual language. This necessarily requires the Court to grapple with facts outside the four corners of the Leases to determine whether the requests for relief are appropriate.

The Court starts with AC Ohio's and AC Massachusetts's first request for declaratory relief, pertaining to Section 4 of the Leases. Section 4 of the Ohio Lease provides in pertinent part:

> As of the Effective Date of this Second Amendment to Lease Agreement, the monthly Rent payable under the Lease shall be $108,399.87, which shall be payable in advance, without notice, demand, or offset (except as otherwise expressly set forth herein), *on the first day of each and every month during the term of this Lease.*

(Doc. No. 1-18 ¶ 4) (emphasis added). Section 4(a) of the Massachusetts Lease states a similar, but not identical, payment demand:

> Tenant hereby covenants and agrees to pay Landlord as annual rent for the Leased Property the amount set forth on Schedule 4, which is attached hereto and incorporated herein by reference, *payable in monthly installments* as set forth on Schedule 4 ("Rent"), in advance, without notice, demand, or offset (except as otherwise expressly set forth herein), *on the first day of each and every month during the term of this Lease. Such installments will be paid at Landlord's offices or such other address as Landlord may notify Tenant in writing.*

(Doc. No. 1-19 ¶ 4(a)) (emphasis added).

Viewing the plain language of Section 4 of the Ohio Lease and Section 4(a) of the Massachusetts Lease, it is clear that monthly payments are due "on the first day of each and every month" during the Leases' terms (Doc. No. 1-18 ¶ 4; Doc. No. 1-19 ¶ 4(a)). Aultman Hosp. Ass'n v. Community Mut. Ins. Co., 46 Ohio St.3d 51, 55 (1989) (Under Ohio law, when a contract is unambiguous, "courts will not give the contract a construction other than that which the plain language of the contract provides."); Polito v. Sch. Committee of Peabody, 686 N.E.2d 624, 626–

21

27 (Mass. Ct. App. 2007) (Under Massachusetts law, courts must "interpret the words in a contract according to their plain meaning.") (internal quotations and citation omitted). However, what is not apparent from the face of the Ohio and Massachusetts Leases is whether the funds must be *dated* by the first day of each month, or in the landlord's *possession* by the first day of each month. Further, neither Section 4 of the Ohio Lease, nor Section 4(a) of the Massachusetts Lease, provide for the proper vehicle of payment. (Doc. No. 1-18 ¶ 4; Doc. No. 1-19 ¶ 4(a)). These unanswered questions are at the heart of AC Ohio's and AC Massachusetts's first requests for declaratory relief (Doc. No. 1 ¶¶ 79, 83), and ACREG's actions against AC Ohio and AC Massachusetts for unpaid rent.

To properly determine whether this declaratory relief is appropriate, the Court must resolve the ambiguity in Section 4 of the Ohio Lease and Section 4(a) of the Massachusetts Lease. That requires, at minimum, interpretation of extrinsic evidence to ascertain the meaning of those provisions under the Leases. McAuley v. Brooker, 101 N.E.3d 1118, 1122 (Ohio Ct. App. 2017) (Under Ohio law, "when the plain language of the written instruments is ambiguous, then a court can look to parol evidence to resolve the ambiguity and ascertain the parties' intent."); Winchester Gables, Inc. v. Host Marriot Corp., 875 N.E.2d 527, 533 (Mass. Ct. App. 2007) (Under Massachusetts law, parol evidence "does not bar extrinsic evidence that elucidates the meaning of an ambiguous contract") (internal quotations and citation omitted). Were the Court to engage in that analysis here, it risks conflicting with the courts presiding over the Ohio and Massachusetts Eviction Actions in two ways: (1) by weighing different parol evidence differently; and (2) ultimately coming to a different legal conclusion as to the meaning of Section 4 of the Leases.

The same is true for AC Ohio's and AC Massachusetts's second requests for declaratory relief as to the proper meaning of "operating expenses" under the Leases. (Doc. No. 1 ¶¶ 79, 83).

22

The Ohio and Massachusetts Leases have similar, but not identical, provisions pertaining to the "operating expenses" the tenant (i.e., AC Ohio or AC Massachusetts), is responsible for paying the landlord (i.e., ACREG). Under Sections 6(b) and (c) of the Ohio Lease,

> (b) *Tenant will pay all operating expenses*, including the cost of insurance for the Leased Property provided under Section 10 below, whether such expenses are incurred by Tenant or by Landlord.

> (c) Tenant agrees to contact the taxing authority responsible for assessing the real estate taxes to be paid directly by Tenant to arrange that tax notices be sent directly to Tenant. Landlord agrees to take all necessary actions, including executing documentation, to effectuate tax notices being sent directly to Tenant by the taxing authority. However, *to the extent Landlord seeks payment or repayment of operating expense*, real estate taxes or insurance expense, *Landlord agrees any such demand will be made to Tenant in writing at least thirty (30) days in advance of the due date*.

(Doc. No. 1-13 ¶ 6(b); Doc. No. 1-18 ¶ 5) (emphasis added). The Massachusetts Lease contains only the first provision in the Ohio Lease pertaining to operating expenses, stating under Section 6(b):

> (b) *Tenant will pay all operating expenses*, including the cost of insurance for the Leased Property provided under Section 10 below, whether such expenses are incurred by Tenant or by Landlord.

(Doc. No. 1-19 ¶ 6(b)). The parties agree that it is unclear from the face of the Leases what is the proper definition of "operating expenses." (Doc. No. 43 at 5; Doc. No. 44 at 5). The Court agrees with the parties' assessment that this term is ambiguous, given it is not defined in either Lease. (See generally Doc. Nos. 1-13, 1-18, 1-19). This ambiguity, once again, poses a problem for the Court in evaluating these requests for declaratory relief, as this very issue is implicated in the Ohio and Massachusetts Eviction Actions.

Like the ambiguity on the date and manner of rent payment above, the ambiguity on what constitutes an "operating expense" under the Leases requires extrinsic evidence to properly give the term meaning. McAuley, 101 N.E.3d at 1122; Winchester Gables, Inc., 875 N.E.2d at 533.

23

Without evidence demonstrating what the parties intended "operating expenses" to constitute, the Court cannot grant AC Ohio and AC Massachusetts the second form of declaratory relief they seek. (Doc. No. 1 ¶¶ 79, 83 (requesting declaratory relief that "operating expenses" includes only "CAM, insurance, and taxes")). Again, if the Court were to engage in this analysis here, it could consider parol evidence and interpret Section 6 of the Leases in a manner that is different or inconsistent with the Ohio and Massachusetts courts' findings in those Eviction Actions.

Given the ambiguous nature of Sections 4 and 6 of the Leases, the Court would benefit greatly from the Massachusetts and Ohio state courts' analyses of that evidence as applied to Sections 4 and 6 the Ohio and Massachusetts Leases. Flowers, 513 F.3d at 560. Ultimately, there are various factual issues surrounding AC Ohio's and AC Massachusetts's requests for declaratory relief: the proper date of rent payment; the proper method of rent payment; and the meaning of "operating expenses." These issues have likely already been addressed, to some degree, by the Ohio and Massachusetts state courts. It is not in this Court's or the parties' interests to create a conflicting ruling on those issues here. Flowers, 513 F.3d at 560. Given this, the first subfactor weighs against exercising jurisdiction over Counts II and III.[8]

---

[8] Plaintiffs' briefing suggests that they seek declarations that they did not breach the Leases under Section 14 of the Leases. (See, e.g., Doc. No. 44 at 3 ("Plaintiffs are seeking . . . a declaration that no uncured Event of Default exists which would support an eviction."), 5 (characterizing their first requests for declaratory relief as "was it an Event of Default to tender a rent check that arrived before the expiration of the 30-day notice and cure period")). As a threshold matter, it is not apparent to the Court how the Event of Default provision of the Leases applies to Plaintiffs' first request for declaratory relief that centers around the date rent is originally due. (See Doc. No. 1 ¶¶ 79, 83). In any event, to the extent AC Ohio and AC Massachusetts seek declarations that they did not breach their respective Leases because their February rent payments were received before the end of the 30-day notice and cure period, these are questions of fact that are not appropriate for this Court to decide through declaratory relief, particularly given the Ohio and Massachusetts state courts have likely already opined on these issues. See Suburban Realty L.P. v. MD Vape and Tobacco, LLC, 224 N.E.3d 598, 605 (Ohio Ct. App. 2023) (under Ohio law, "[t]he question of whether a party has materially breached a contract is a question of fact"); EventMonitor, Inc. v.

ii. Position of State Courts

The second subfactor, whether the state court is in a better position to evaluate the factual issues just discussed, emphasizes that district courts "generally consider state courts to be in a better position to evaluate novel questions of state law." Flowers, 513 F.3d at 560. While a district court need not "always turn away a declaratory judgment action when an undetermined question of state law is presented, [] it is an appropriate consideration for the court to weigh in the exercise of its discretion." Id. (internal quotations and citation omitted). However, where the case "involves an ordinary application of state contract law principles and involves no novel question of state law nor an unusual application of factual issues," this factor weighs in favor of exercising jurisdiction. Boyd, 2023 WL 4903173, at *7 (citing Hoey, 773 F.3d at 761).

Defendants contend that this factor weighs against exercising jurisdiction, given Plaintiffs seek to present the novel question of "whether landlords 'have a duty' to withdraw from reserve accounts to cover delinquent rent[.]" (Doc. No. 43 at 5–6). This argument misses the mark, as it fails to recognize that Count I is the only declaratory judgment claim that pertains to the Reserve Account issue. (Doc. No. 1 ¶ 75, see id. ¶¶ 79, 83). Given this oversight, Defendants' arguments are irrelevant to the Court's analysis of the applicability of the second subfactor to Counts II and III.

Regardless, the Court agrees with Plaintiffs that this case presents normal contract interpretation issues that raise "no concern about federal encroachment on the state courts[.]" (Doc. No. 44 at 6). Counts II and III request declaratory relief that hinge on the interpretation of Sections 4 and 6 of the Ohio and Massachusetts Leases. (Doc. No. 1 ¶¶ 79, 83). Both Ohio and Massachusetts state law counsel that contract interpretation is a question of law for the Court's

_____

Leness, 473 Mass. 540, 546 (2016) (under Massachusetts law, "[w]hether a party has committed a material breach ordinarily is a question of fact").

consideration.  See Tera, 176 Ohio St.3d at 509; Smith, 223 N.E.3d 550.  Even where these requests

for declaratory relief present the Court with ambiguity as to Leases' proper interpretations, Ohio

and Massachusetts law are clear on how to handle such circumstances.  See McAuley, 101 N.E.3d

at 1122; Winchester Gables, 875 N.E.2d at 533; Suburban Realty, 224 N.E.3d at 605;

EventMonitor, 473 Mass. at 546.  Because no novel issues of state law are presented that would

require this Court to encroach on the Ohio and Massachusetts state courts' interpretations of its

own laws in answering those questions, this subfactor weighs in favor of exercising jurisdiction

over Counts II and III.  See Hoey, 773 F.3d at 761 (where the case does not raise a "novel or

difficult question[ ] of state law" and where the state trial court was not in a better position to

evaluate the factual issues, the case "does not raise serious concerns about federal encroachment

on the state courts, such that the district court should decline jurisdiction").

iii.   Nexus Between Issues and State Law

The Court turns to the third subfactor, the nexus between the underlying factual and legal

issues and state law.  This subfactor "focuses on whether the issue in the federal action implicates

important state policies and is, thus, more appropriately considered in state court."  Flowers, 513

F.3d at 561.  This subfactor is more likely to weigh against exercising jurisdiction where a case is

"brought pursuant to the federal courts' diversity jurisdiction and neither federal common law nor

federal statutory law apply to the substantive issues of the case."  Bituminous, 373 F.3d at 816;

see Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC, 495 F.3d 266, 273 (6th Cir. 2007)

("This is not a case where federal law will come into play, and, therefore, a state court forum is

preferable.").

Plaintiffs give little weight to this subfactor, deeming it "neutral."  (Doc. No. 44 at 6).

Defendants find this factor weighs against this Court exercising its jurisdiction, stating this action

"boils down to whether Plaintiffs failed to pay rent," which implicates eviction proceedings that

26

relate to important state interests.  (Doc. No. 43 at 6–7).  In making this argument, Defendants rely on various unreported district court cases analyzing the <u>Younger</u> abstention doctrine.  <u>See</u> <u>Younger v. Harris</u>, 401 U.S. 37 (1971).  There, those courts refused plaintiffs' requests to interfere with ongoing state eviction proceedings because of the states' interests in those proceedings.  (<u>See</u> <u>id.</u> (citing <u>Leonard v. Montgomery</u>, 2023 WL 1070246, at *2 (S.D. Ohio Jan. 27, 2023) (collecting cases)).

The Court agrees with Defendants that the underlying factual issues are directly tied to state law such that the Ohio and Massachusetts state courts are the more appropriate forums for these disputes.  While not binding on this Court, nor directly applicable to the instant suit, Defendants' references to <u>Younger</u> abstention cases stating that state eviction proceedings implicate important state interests are relevant here. In this case, Plaintiffs unsuccessfully requested this Court intervene in the Eviction Actions last year by requesting injunctive relief that would have prevented the evictions from taking place, as well as declaratory relief that Plaintiffs were in compliance with the Leases.  (Doc. No. 3 at 2; Doc. No. 19 (denying Plaintiffs' Emergency Motion for Temporary Restraining Order where Plaintiffs asked "this Court to issue an injunction preventing Defendants from evicting or otherwise disturbing Plaintiffs' property rights in the Texas, Ohio, or Massachusetts premises")).   Given this, AC Ohio's and AC Massachusetts's requests for declaratory relief amounting to declarations that they were in compliance with the Ohio and Massachusetts Leases undoubtedly implicate Ohio's and Massachusetts's state interests in having their own eviction proceedings.  <u>See</u> <u>Leonard</u>, 2023 WL 1070246, at *2 (collecting cases).

The important implications of state interests aside, the close nexus between state law and the applicable requests for relief further counsel against exercising jurisdiction.  All of the factual

27

issues surrounding AC Ohio's and AC Massachusetts's requests for declaratory relief are directly tied to Ohio and Massachusetts state laws. Importantly, these factual issues are the same ones "that [are] pending in [those] state court actions." Bituminous, 373 F.3d at 816. Ultimately, "[t]he [Ohio and Massachusetts] state courts [are] in a better position to evaluate the factual issues because they rest[] solely on state law with which the state courts are better acquainted." Id. Further, this case is brought pursuant to diversity jurisdiction; no application of federal law is necessary to resolve Counts II or III. Id.

The Court finds that the factual and legal issues underlying AC Ohio's and AC Massachusetts's declaratory judgment claims are best resolved by the state courts already applying and interpreting their own laws in considering the same issues. Accordingly, the fourth Grand Trunk factor heavily weighs against this Court exercising its jurisdiction over Counts II and III.

### b. Count I

The Court turns to the applicability of the fourth factor on Count I. As to the first and second subfactors, there are no underlying factual issues relating to Count I that are also pending before a state court, given the Texas Eviction Action is pending in the Northern District of Texas (Freedom Healthcare Properties of Texas, LLC v. Addiction Campuses of Texas, LLC, Case No. 3:24-cv-00789-N). See Bituminous, 373 F.3d at 815 (evaluating the first and second factors in the context of underlying state court actions). Because there is no state action the Court would be interfering with by exercising its jurisdiction over Count I, these factors counsel towards exercising its jurisdiction over Count I. As to the third factor, like with Counts II and III, this factor weighs against the Court exercising its jurisdiction because AC Texas has attempted to use this action to interfere with state eviction proceedings in Texas, and the Court will rely solely on Texas state law in evaluating Count I. Bituminous, 373 F.3d at 816; see Travelers, 495 F.3d at 273, see supra, Section II.2.C.a.iii.

Given that two of the three subfactors weigh in favor of exercising jurisdiction, the fourth Grand Trunk factor weighs in favor of exercising jurisdiction over Count I. See Grand Trunk, 746 F.2d at 326; see Northland Ins. Co. v. Stewart Title Guar. Co., 327 F.3d 448, 454 (6th Cir. 2003) (upholding district court's finding that the fourth Grand Trunk factor weighed in favor of jurisdiction where first two subfactors supported jurisdiction, but third subfactor did not because the action was governed solely by state contract law).

### D. Availability of Alternative Remedy

The fifth Grand Trunk factor examines "whether there is an alternative remedy which is better or more effective" than the requested declaratory relief. Grand Trunk, 746 F.2d at 326. Defendants contend that this factor weighs against exercising jurisdiction, given the state courts have the superior positions to resolve the cases, and there is no reason to suppose that alternative remedies in the state courts cannot account for the rights Plaintiffs seek to preserve with their declaratory judgment actions. (Doc. No. 43 at 8–9). Plaintiffs counter that the "obvious alternative remedy [] for this Court to stay or dismiss this lawsuit and allow the Eviction Actions to proceed" is not superior because such action would force Plaintiffs to relitigate the same questions in three separate fora, and the breach of contract claim would remain pending in this Court. (Doc. No. 44 at 6–7). While the parties again fail to consider the different positions of the Texas Eviction Action from the Ohio and Massachusetts Eviction Actions in evaluating Plaintiffs' requests for declaratory relief, the Court does. Again, the Court will consider Count I separately from Counts II and II in addressing this final factor.

### a. Counts II and III

On Counts II and III, the Court agrees with Defendants that the alternative remedy of allowing the Ohio and Massachusetts state courts to handle the questions presented by the declaratory relief requested on the Ohio and Massachusetts Leases is most appropriate. The Ohio

29

and Massachusetts state courts are in the best positions to handle the relief requested here, as both state laws fully account for the relief AC Ohio and AC Massachusetts seek in Counts II and III. See Waldman v. Pitcher, 70 N.E.3d 1025, 1030 (Ohio Ct. App. 2016) (under Ohio law, "any person interested under a written contract, or other writing constituting a contract, may bring a declaratory-judgment action to have a court determine any question of construction or rights arising under the contract, either before or after there has been a breach of the contract[,]" citing Ohio Rev. Code Ann. §§ 2721.03, 2721.04) (internal quotations omitted); Sahil v. Bull HN Information Sys., Inc., 437 Mass. 696, 705 (2002) (under the Massachusetts Declaratory Judgment Act, Mass. Gen. Laws Ann. ch. 231A, § 1, "[t]he determination of contractual rights is a proper subject" of a proceeding).

True, the Sixth Circuit presents conflicting authority "regarding whether the possibility of seeking a declaratory judgment or an indemnity action in state court counsels against the district court exercising jurisdiction." Flowers, 513 F.3d at 562 (internal citations omitted). However, there is good reason to follow the Sixth Circuit authority stating the option for declaratory relief in state court weighs against this Court exercising its jurisdiction here. See Travelers, 495 F.3d at 273 (finding that the alternative remedies of a state declaratory judgment or indemnity action "weighed against federal discretionary jurisdiction"); Bituminous, 373 F.3d at 815 (finding that plaintiff "could have presented its case to the same court that will decide the underlying tort action").

The Ohio and Massachusetts state courts present the better venue for the declaratory relief posed in Counts II and III for two obvious reasons. First, AC Ohio's and AC Massachusetts's use of their own state laws is far superior to the use of this Court, in that state declaratory remedies have "the advantage of allowing the state court[s] to apply [their] own law." Cole's Place, 936

F.3d at 401.  Second, in this circumstance, both the Ohio and Massachusetts Eviction Actions have

progressed much further in the litigation process than the instant suit.  During those proceedings,

the parties have had the opportunity to fully address AC Ohio's and AC Massachusetts's payments

under their respective Leases, whether those payments were compliant with the Leases, and the

proper value of "operating expenses" they owed ACREG under the Leases.   In the Ohio Eviction

Action, judgment has already been rendered in AC Ohio's favor.  (Doc. No. 54 at 2).  In the Ohio

Massachusetts Eviction Action, the parties are months from trial.  (Id.).  Considering this, the

natural and more efficient thing for AC Ohio and AC Massachusetts to do would have been for

them to file declaratory actions in those state courts.  In doing so, the Ohio and Massachusetts

courts "might also have been able to combine the two [respective] actions so that all issues could

be resolved by the same judge."  Massachusetts Bay Ins. Co. v. Christian Funeral Directors, Inc.,

759 F. App'x 431, 441 (6th Cir. 2018).

Given the superior position the Ohio and Massachusetts state courts are in to handle AC

Ohio's and AC Massachusetts's requested declaratory relief in Counts II and III, "[t]here is no

reason to suppose that alternative remedies available in state court[s] would not adequately protect

[AC Ohio's and AC Massachusetts's] interests."  Bituminous, 373 F.3d at 816.  For the Court to

step in at the eleventh hour of the Ohio and Massachusetts Eviction Actions and provide

declaratory relief impacting those actions that AC Ohio and AC Massachusetts could have

obtained in their respective state courts is nonsensical and would only cause chaos for all parties

involved.  The Court finds that the fifth Grand Trunk factor counsels against it exercising

jurisdiction over Counts II and III.  See Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of

Pittsburgh, PA, 29 F.4th 792, 801 (6th Cir. 2022) (district court did not abuse discretion in finding

state court would protect plaintiff's interest where state law provided for declaratory relief plaintiff sought in federal court); Massachusetts Bay Ins. Co., 759 F. App'x at 441 (same).

### b. Count I

The Court turns to the fifth factor's applicability to Count I. As discussed, the parties' arguments are largely irrelevant to Count I, as the Texas Eviction Action is proceeding in federal court. Given the Texas Eviction Action's federal forum, the rationale for the Ohio and Massachusetts state courts handling the relief posed in Counts II and III does not apply here. As a result, Defendants fail to present an alternative, better remedy for AC Texas than the declaratory relief it seeks here.

The only obvious alternative remedy to Count I would be for AC Texas to seek the same relief in the Texas Eviction Action. Doing so would have provided AC Texas with the same remedy in that action that it seeks here, but though a consolidated action with a court already aware of the entire scope of the parties' conflicts. Nevertheless, the Northern District of Texas is no better suited to handle requests for declaratory relief than the instant court. Considering this, the Court does not find AC Texas bringing declaratory relief in the Texas Eviction Action to be a better remedy than this Court deciding Count I. Accordingly, the fifth factor weighs in favor of this Court exercising its jurisdiction over Count I.

### E. Weighing the Grand Trunk Factors

Because the Court has analyzed two of the Grand Trunk factors on Count I separately from Counts II and III, the Court will do the same in weighing the factors together.

### a. Counts II and III

On Counts II and III, the first and second factors weigh in favor of the Court exercising jurisdiction, while the third, fourth and fifth factors counsel against jurisdiction. Weighing these considerations together, the Court finds exercising jurisdiction over Counts II and III creates more

32

harm than good. "Overall, comity weighs against exercising jurisdiction when there is a possibility that a district court might 'render a judgment inconsistent with the state court' on issues of state law." Cardinal Health, 29 F.4th at 800 (quoting Bituminous, 373 F.3d at 816). Here, Defendants are correct that should the Court seek to exercise its jurisdiction over AC Ohio's and AC Massachusetts's declaratory judgment claims, "friction between the [state] courts" and this Court may become "an actuality, not a mere possibility." Bituminous, 373 F.3d at 816. This Court's declarations on Counts II and III could create confusion between three different courts; would almost certainly create piecemeal litigation; may result in inconsistent rulings; and would likely interfere with proceedings on the same issues in the Ohio and Massachusetts state courts that are farther along than the current suit. With these considerations in mind, basic federalism and judicial economy principles dictate that this Court must refuse to exercise its jurisdiction over Counts II and III. See U.S. Fire Ins. Co., 161 F. App'x at 564 ("[A] district court does not need to point to 'exceptional circumstances' in declining to exercise jurisdiction in a declaratory judgment suit."). Counts II and III will be dismissed.

Given the dismissal of Counts II, III, and V, see supra, Section II.2.B n.7, ACREG, AC Ohio and AC Massachusetts can no longer remain in this case. Counts II, III and V are the only counts in the Complaint pertaining to ACREG, AC Ohio and AC Massachusetts. (See Doc. No. 1 ¶¶ 72–97). In dismissing these counts, AC Ohio and AC Massachusetts both lack standing, as no claims remain pertaining to either that allege injuries that could be redressed by this Court. See Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (internal citations omitted); see also Wachovia Bank v. Schmidt, 546 U.S. 303, 316 (2006) ("Subject-matter jurisdiction, on the other hand, concerns a court's competence to adjudicate a particular category of cases; a matter far weightier than venue, subject-matter jurisdiction must be considered by the court on its own motion, even if

33

no party raises an objection.").  Further, there are no more claims pending against ACREG, making its dismissal from the case necessary.  Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); see Letherer v. Alger Grp., 328 F.3d 262, 267 (6th Cir. 2003), overruled on other grounds by Blackburn v. Oaktree Cap. Mgmt., 511 F.3d 633 (6th Cir. 2008).  Accordingly, ACREG, AC Ohio and AC Massachusetts will be dismissed from this action.[9]

### b.  Count I

On Count I, the first, second, fourth and fifth factors weighs in favor of the Court exercising jurisdiction, while only the third factor weighs against jurisdiction.  Given the great weight of the Grand Trunk factors favors exercising jurisdiction over Count I, the Court does so.  Count I will remain pending before the Court.

### 3.  Applicability of the Colorado River Abstention Doctrine to Count IV

Having determined the scope of declaratory relief at issue in this case, the Court now turns to FHPT's request that the Court abstain from hearing AC Texas's and OMT's remaining claims pursuant to the Colorado River abstention doctrine.  Here, the Court focuses only on Count IV, as AC Texas's request for declaratory relief under Count I is not properly subject to the Colorado River abstention doctrine.  See supra, Section II n.4; Boyd, 2023 WL 4903173, at *4; Wilton, 515 U.S. at 289.

"In Colorado River, the Supreme Court noted that, despite the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them,' considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts."  Romine v. Compuserve

---

[9] Because FHPT, AC Texas, and OMT are the only remaining parties, the Court will refer to them exclusively for the remainder of its opinion.

Corp., 160 F.3d 337, 339 (6th Cir. 1998) (quoting Colorado River, 424 U.S. at 817). The principles underlying the Colorado River abstention doctrine "rest on considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" Colorado River, 424 U.S. at 817 (quoting Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952)).

In making their respective arguments on abstention, the parties make the same mistake they do in their Grand Trunk briefing: they fail to consider that the Texas Eviction Action is proceeding in federal court. (See generally Doc. Nos. 27, 33, 35 (discussing the Texas Eviction Action as if it were in state court)). This error is at FHPT's peril. Critically, for the Colorado River abstention doctrine to apply, "the presence of a parallel, *state* proceeding" is necessary. Crawley v. Hamilton Cnty. Comm'rs, 744 F.2d 28, 31 (6th Cir. 1984) (emphasis added). Without a parallel state action to compare the instant action to, the factors considered in the Colorado River test—which evaluate the state court's stature over the case relative to the federal court's—are meaningless. See Bates v. Van Buren Tp., 122 F. App'x 803, 808 (6th Cir. 2004) (quoting Romine, 160 F.3d at 340–41) (factors include "whether the state court has assumed jurisdiction over any res or property," "whether the source of governing law is state or federal," "the adequacy of the state court action to protect the federal plaintiff's rights," and "the relative progress of the state and federal proceedings," among others). The inapplicability of the Colorado River abstention doctrine to Count IV is demonstrated by the parties' failure to, and this Court's inability to find, any case applying the doctrine to parallel federal proceedings.

Given FHPT's glaring failure to take the Texas Eviction Action's status as a federal case into account, FHPT has failed to raise any fruitful argument for dismissal of AC Texas's and

OMT's breach of contract claim. (See Doc. No. 27 (raising the Colorado River abstention doctrine as the only ground for dismissal)). Without more, its motion on that claim must be denied.

      4.  FHPT's Request for a Stay on Counts I and IV

In the alternative to their Colorado River abstention arguments, FHPT "seek[s] an order staying this case pending a final determination in the Eviction Actions." (Doc. No. 27 at 14–15). AC Texas and OMT oppose this request, properly stating that FHPT "ha[s] not provided the Court with any adequate basis upon which to [] stay this case[.]" (Doc. No. 33 at 7–8). That is true. Nonetheless, the Court does not need one. It is beyond dispute that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. North American Co., 299 U.S. 248, 254 (1936). "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." Id. at 254–55.

The Court finds that unique posture of this case warrants a stay pending the resolution of the Texas Eviction Action. The Court understands that instituting a stay on the current proceedings will force AC Texas and OMT to wait to further litigate their breach of contract claim against FHPT. But this burden is greatly outweighed by the Texas Eviction Action having already convened a trial on the same underlying issues that AC Texas and OMT base Counts I and IV on, their performance and FHPT's performance under the Texas Lease and Settlement Agreement. (Doc. No. 54 at 1–2; Freedom Healthcare Properties of Texas, LLC v. Addiction Campuses of Texas, LLC, Case No. 3:24-cv-00789-N, Doc. Nos. 1, 29). The determinations of these disputes are under advisement by the presiding court. (Doc. No. 54 at 1–2). The outcome of the Texas Eviction Action will invariably impact, and will likely bind this Court in deciding, Counts I and IV. Even more likely, the outcome of the Texas Eviction Action could moot these proceedings entirely. Accordingly, the Court finds judicial economy, fairness, and efficiency dictate that a stay

of proceedings is warranted. The Court will grant FHPT's motion to stay of proceedings pending the resolution of the Texas Eviction Action.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 26) will be granted in part on Counts II, III and V, will be granted as to a stay pending the resolution of the Texas Eviction Action (Northern District of Texas, Case No. 3:24-cv-00789-N), and will be denied in part in all other respects. Pursuant to Rules 12(b)(1), 12(b)(6) and 21, ACREG, AC Ohio, and AC Texas will be dismissed from this case.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE